Gibson J.
I concur. Whether any other decree than that of Aranjuez, prohibiting trade in productions of British manufacture, was in force at Porto Cabello at the time of the capture, was fairly submitted to the jury. It was a question of fact on which the jury have passed, and I am unwilling to disturb the verdict on that ground. The Judge who tried the cause intimated a strong opinion that the Berlin decree, adopted by that of Aranjuez, was the sole foundation of the condemnation. Can the correctness of that opinion be questioned ? What evidence have we of any other decree prohibiting trade in British manufactured goods ? The sentence states the condemnation to have been conformable to the act of the captain general of the Caraccas, the royal order of .the 25th of August, 1806, and the Aranjuez decree of the 23d of February, 180/, including the Berlin decree. The royal order is conceded on all hands to have been a mere distributory regulation ; and in no part of the sentence is it intimated that the act of the captain general is prohibitory of this trade. It is indeed said by the auditor, in his speech before the council, to be of that character: but I take this speech, for all purposes of legal evidence, to be no part of the proceedings of that tribunal. We can only look to the adjudicative part of the sentence, which is evidence of facts clearly and expressly there set out, but of none other. But if the whole of the speech were evidence, to what credit is it entitled ? It was evidently got up on the occasion, to reconcile the people at Porto Cabello to this course of proceeding, (which appears to have been extremely unpopular,) by exciting their passions against England. It is impossible not to perceive that this was the intention. Shall we consider this declamatory harangue, full of sound and fury, as a recital of matter of fact ? The auditor addressed himself to the passions, and with such an object to accomplish, what would he not assert ? On the other hand, when it is considered that up to the time of the Aranjuez decree, goods of British *63 manufacture were freely admitted to entry in the ports of this province, and sold in open market; that the governor of St. Thomas was ignorant of any previous prohibition; that persons acquainted with the course of trade at Laguira, were ignorant of it; the ease w.ith which it'might have been proved if it really had existed ; that the sentence of condemnation was as prize of war, and nearly in the words of that part of the Berlin decree that was applicable to the subject; and the inordinate proportion of the forfeiture allotted to the owners and crew of the privateer, we are precluded from believing that the sentence was grounded on any other decree than that of Berlin. It was the business of the defendant to make out to the satisfaction of the jury that the trade was prohibited within the meaning of the warranty or exception. This was not done, unless the Aranjuez decree be sufficient for that purpose. The existence of the act of the captain general has been shewn, but its purport has not been shewn; and it is too much to call on us to say the council proceeded under a law that we do not know to have been applicable to the matter before it, when another law is shewn within the purview of which the case directly falls.
The condemnation, then, must be taken to have been under the Berlin decree. If that decree be contrary to the law of nations, the plaintiff ought to recover; for it is not sufficient that the trade be prohibited in fact; it must also be legally prohibited. There must be no infraction of neutral rights. A law, the enactment of which transcends the legitimate power of the sovereign who declares it, is merely void, and a seizure, under it, an act of unauthorised violence. Such a law was not within the view of the parties to this policy when the clause in question was introduced. Every soi vereign has an absolute right of legislation, within his own territory, and his laws, operating within, and exclusively applied to the territory, are strictly municipal; although they may be, at the same time, belligerent measures ; and on the latter ground, merely, it is not competent to neutrals to question their validity. Such were our embargo and non-intercourse laws, during our late contest with England. Foreigners entering the territory of á nation subject themselves to all the laws they there find in force, and a want of knowledge of the existence of such laws, or an evident impossibility of being able to obtain it, will not be sufficient to exempt them. *64 But no country has a right, unless with respect to its own subjects, to give to its laws, an extra-territorial effect. On ^ high seas, the subjects of a power are under its legislative controul; but the subjects of another power, never.
With respect to the Berlin decree, I perfectly concur with the opinion expressed in this cause on a former occasion by Mr. Justice Ye ates, that it has a double character} as far as it was intended to operate within the territory of the sovereign declaring- it, it is municipal} but as far as it was intended to operate on the sea, or in countries not subjected to his power by the destruction of the ancient government, and the substitution of one, not only actually but ostensibly under his direction and controul, it violated the law of nations, and was null and void. At the time of the seizure of the schooner, trade in goods of British manufacture, was legally prohibited within Spain and her colonies. I admit also, that for a meditated violation of that prohibition, Spain might legally seize such goods at any indefinite distance from her shores ; and this, as a measure of preventive justice, not extending the operation of her municipal laws beyond her own limits, but one, as I take it, authorised by the law of nations, as being absolutely necessary to protect her municipal regulations from being infringed. But this decree was intended to operate on the land and on the water as far as the French or Spanish power to enforce it should extend. As to its contemplated extra-territorial effect it was void. Then in what aspect did the council of Porto Cabello apply it to the property condemned ? Unquestionably, I think, in that aspect in which it was void. The condemnation was as prize of war. The council made no secret of the light in which it viewed the matter. By the decree in its valid character, the sentence was not warranted. The constituted authorities of Spain. who acted on the subject, complain of no violation of the municipal laws of the country. Although, perhaps, the privateer might have seized, and the council have justly condemned the goods on that ground, they chose to rest on another ; and a seizure or condemnation on illegal grounds is not the less a violation of neutral rights, because the property might have been confiscated under a law perfectly unexceptionable. It is the illegal pretension, that renders the seizure an act of lawless violence. It cannot be said that this was, in the language of the warranty, “ a seizure and detention *65 for and on account of illicit or prohibited trade.” It was a seizure as prize of war. Spain had a right, if she thought proper, to overlook the infraction of her municipal regulations; it was a matter between her and those who violated them. If she please to pardon, it does not lie with the der r 7 # fendant to say she shall not; neither will her having forgiven an injury justify her in inflicting another. No loss has been sustained in consequence of the infraction of the municipal laws of Spain. Spain by her tribunals has said so ; and the defendant will not be permitted to allege the contrary.
But were this decree valid in all its bearings, or even were this a condemnation under it in that character in which it unquestionably is valid, still I am not disposed to think it a law creating such a prohibition, as was within the meaning of the parties to this contract. I lay no stress on this clause having been first inserted during a state of peace, and before the existence of that unnatural state of violence which superseded the settled maritime laws and usages of nations ; I pay much more respect to the opinions of commercial men. Where the meaning of a particular clause is doubtful, the usage that has prevailed on the subject, is the surest and safest interpreter of the intention of the parties. A blockade supported by an adequate force creates an interdiction of trade with the port or place blockaded, the validity of which has never been contested by neutrals ; yet it never was supposed to be a prohibition within this clause. In all the cases of seizure in port by Napoleon under his decrees of this mixed character, I believe no underwriter of a policy containing this clause, has thought it worth his while to urge it as a defence. In fact we have, impliedly, the construction put on it by the several insurance companies of Philadelphia, in the unanimous resolution of their officers to provide specially in subsequent policies against responsibility for seizures in a French port, in consequence of the vessel having visited, or having been carried into a British port. This would' have been unnecessary if this clause had been considered as sufficient to exempt from risk. It may be a difficult matter to lay down a general rule to govern in all cases the construction of the clause in question. I would say the prohibition must arise from a law exclusively municipal, (or in other words intra-territorial,) carrying with it no pretension of unwarrantable power in the sovereign enacting it. But whether *66 it be a standing peace regulation, or a temporary belligerent expedient, will be equally immaterial. The clause was originally introduced to exclude risk arising from a contravention iaws, that' the sovereign power of a nation had a to enact without regard to the motives that led to their enactment; and I do not find, from the. usage of the commercial world, its operation has since been either abridged or enlarged.
The objection to the verdict on the ground of fraudulent concealment comes too late ; it was not insisted on at the trial; and a party shall not be permitted to reserve for a motion of this kind a matter which he does not think proper to submit to the consideration pf the jury. If he has been injured by the verdict in this regard, it is his own fault; we should never have an end of granting new trials if the rule were otherwise. But if the objection were made in' time there is nothing in it. The plaintiffs, when they instructed their agents in Philadelphia to effect insurance, were ignorant of the existence of the Aranjuez decree, and could not foresee, that the peculiar character of the property would enhance the risk; and although that decree was known here when the policy was subscribed, it does not appear the agents knew the goods were of British manufacture. The principal will undoubtedly be affected by the acts of his ageiit; but fraud shall not be imputed, where neither the principal nor agent were separately in possession of all the facts, and which, when taken in- the aggregate only, could vary the risk.
Duncan J.
I will not load this case with a repetition of the opinion on the legal questions delivered by me in the charge to the jury, and shall content myself with a few observations on one branch of the case ; what is the cause assigned by the sentence for condemnation ? or, in other words, is the warranty, (warranted by the assured, free from any charge, damage, or loss occasioned, or which may arise in consequence of the seizure or detention of the property, for or on account of any illicit or prohibited trade,) negatived in the sentence ? for I am confirmed in the opinion, for the reasons I have assigned in the instructions to the jury, that unless this is clearly expressed, or fairly to be drawn from the sentence, that the plaintiffs are entitled to recover; nay, I *67 would go further, for it is .deeply impressed on my mind, that if the sentence purports to be founded on several distinct decrees, different in their nature, one of them of a belligerent aspect, and the other domestic, one respecting a seizure of enemies’ goods on board a friendly ship, or respecting a seizure and confiscation of the goods of a friend. on board the ships of a friend, merely on the ground of their hostile origin, as that they were of British manufacture, and the other the prohibition of the importation of certain goods, and the cause of condemnation is assigned in the very words of the decree for confiscating the goods, because they were of British manufacture, or because they were enemies’ goods, I would hold the condemnation to be on that decreé, the language of which is adopted in the condemnatory clause, and consider the sole ground of the condemnation to be the cause thus assigned; as in this case, because they were of British manufacture. It would likewise appear to' me, that if it were even doubtful, from the obscurity of the sentence, (and from its foundation resting on several decrees, or orders, with different aspects, some of them in nature of seizure jure belli, and others merely regulations of navigation and trade,) on which the condemnation was founded, it would not comport with justice, to pronounce that the condemnation was for the latter cause, and thus by conjecture negative the warranty, and strip the assured of that indemnity for which he has paid.
The principles laid down in Park, 365, have a striking application. 1. If the sentence be so ambiguous and doubtful, that it is difficult to say on what ground the decision turned; or, 2. If the sentence on the face of it, be manifestly against law and justice, or contradictory, the assured shall not be deprived of his indemnity, because, to use the words of Mr. Justice Buller, any detention by particular ordinances, which contravene, or do not form a part of the law of nations, is a risk within the policy.
What is the express ground of condemnation ? Goods of British manufacture. That fact the sentence decided, and if it can be collected from the sentence itself, on what ground the foreign Court decided, that is conclusive. Calvert v. Bovill, 7 T. R. 526. Nor can the premises which led to such conclusion, controul the sentence. In Christie v. Secretan, 8 T. R. 192, the court say, “ We can only look at the ground *68 of decision; that is, because the ship belonged to the ene* mies of the French republic, and cannot look at the previous reasons which are stated; among which were, that the ship was not documented according to the form of treaty j between the United States and France, and, therefore, not an American vessel, as that is not the ground of decision.” If this was not the ground of decision, what was ? If not for this, the cause is doubtful, ambiguous, and obscure, and it cannot be collected reasonably from the whole proceedings, that the condemnation was on account of illicit or prohibited trade. In Bernardi v. Motteux, Doug. 575, a policy on the ship Jane, warranted neutral, the only doubt was, whether the ship was condemned as enemy’s property, or for violating a French arret, by throwing papers overboard. For one or the other of these causes, she was condemned. Yet the plaintiff recovered', because of the obscurity of the sentence, it not being certain, that the ground of condemnation was enemy’s property. And in Pollard v. Bell, 8 T. R. 434, it is observed by Lord Kenyon, “ If contrary to justice the ship had been condemned, simply because she was not a Danish ship, we should have been concluded by the sentence, but as the courts abroad, have endeavoured to give other supports to their judgment which do not warrant it, and have stated as the foundation of their condemnation, one of their own ordinances, which is not binding on other nations, this does not prove that the ship was a neutral ship, and consequently the plaintiff is entitled to recover.”
One reason, at least, if not the only one, is, that the goods were of British manufacture. Compare this with the reason given in Pollard v. Bell. It is stated, says Lord Kenyon, in one of the sentences, that by their own ordinances, all ships are to be confiscated, “ whenever on board there shall be found a supercargo, merchant, commissary, or chief officer, being an enemy.'” But I say, they had no right to bind another nation by said ordinance. It appears, clearly, that the ship was condemned on other grounds; and on the ground that the captain was one of those persons, who, by their own ordinance, they wished to proscribe.
But there, is a rule clearly laid down in Price v. Bell, 1 East, 681, that in the sentence of condemnation, the warranty of the assured must be clearly negatived, not in the express words of the warranty, but-in terms that do not leave *69 the mind in doubt as to the real cause of condemnation; express words or necessary implication. The warranty must be falsified by the sentence itself, or by terms from which it may be fairly inferred. Balton v. Gladstone, 5. East, 160. And so is the law laid down in Church v. Hubbart, 2 Cranch, 232. To fall within the exception, it should appear in the sentence, that the goods were condemned by the government, on account of illicit or prohibited trade.
The legislature of the Union has declared the Berlin and Milan decrees, to be direct and flagrant violations of national law. The Supreme Court of the United States, have so declared them. Williams and others v. Armroyd, 7 Cranch, 432.
If they are so to be considered, and if the Berlin and Aranjuez decrees, are among the causes for condemning these goods; it is settled, nothing can be more established than this ; that if the ground of the decision be a foreign ordinance, manifestly unjust, and contrary to the law of nations, and the insured has only infringed such partial law, this shall not be deemed a breach of his warranty, so as to discharge the indemnity. Park. 363. Pollard v. Bell, 8 T. R. 434. Bird v. Appleton, Id. 563.
These goods were expressly condemned for being of British manufacture, and' the condemnation is in the very words of the Berlin decree. The other decrees and royal orders, are stated in the sentence. ■ The royal order of 25th August, 1806; the decree for opening the ports, as well as the royal order of 19th February, and the imperial decree. The royal order of 25th August, 1806, related only to the distribution of prizes among the captors. What were the precise terms of the decree for opening the ports to the allied powers, we are not informed. When I stated the admission of one of the counsel on the part of the defendants, that the sentence was not founded on any royal order or decree of 25th June, 18Ó6, that admission did not excludé the act ©f the captain general of the Caraccas, for it was contended that the act of the captain general, and the decree for opening the ports were the same, and that this act of the captain general was stated by the auditor general, as one of the causes of condemnation, thus anticipating the sentence of the council, and the opinion, justification, and recommendation of the auditor general, and thus endeavouring to constitute the whole but as one sentence.
*70 In whatever point of view this document is to be considered, whether as authoritative and judicial, a justificatory memorial or decision, or as a recommendation to suspend the execution of a decision already made, until the .royal will should be made known through the high admiralty; if any thing certain can be collected frorti this collection of matters and things ; this mass of discordant materials, by which the auditor general attempts to justify the proceedings of the council of Porto Cabello, edicts, decrees, royal orders, and. acts of the captain general, smuggling enemies’ goods, British manufactures, justification, applause, and invective, delivered in one blaze of rage and vengeance. If he has not enveloped, in still greater obscurity, the sentence itself, it certainly has afforded strong evidence that among the causes producing the condemnation of this property, the Berlin decree and Jiranjuez adoption, were not the least prominent. Nay, leaving it in doubt whether, among these causes, the suspicion of enemies’ property was not mingled. “ This tribunal,” observes the auditor, “ sits in provinces which are censuring the conduct of privateers as violations of the law of neutrality, notwithstanding they are acquainted with the positive data which I have stated, and represent this as a prejudice to commerce, to the treasury, and to agriculture, though they must be well convinced of the contrary by the terms of the royal order of the 19th February, and the imperial decree.” Again, “ It appears, from the proceedings in this case, that there has been published in North America, in the usual form, by the public papers, the imperial decree and royal order of 19th February, which fact argues against all the captured, and convicts them of smuggling.” It will be difficult, on this statement, to maintain that these decrees and royal orders formed no part of the causes of condemnation, when the auditor states that these alone, without other causes, argue against all the captured, and convict them of smuggling. It is not the act of the captain general, but this decree and this order, which convict them. The proceedings in the cause, says the auditor, shew the imperial decree and the royal order, and their publication in North America.
But this is not all, for he recommends to the council “ that the decree should serve for a rule for all prizes of this nature, brought by privateers into this or other ports within their jurisdiction,” and for that purpose, “let a certified *71 copy of the proceedings be sent to all the inferior tribunals, to prevent injuries to the parties Who have recourse to them, and a certified copy of the royal order.” What royal order? Not the act of the captain general; for the act of a captain general, by no liberality of construction, can be converted into a royal order. The royal order was to be the basis of the proceedings .of the inferior tribunals, and the decree in that case was to serve as a rule for all prizes of the same nature. The royal order could not be the decree for opening the ports to the allied powers. Were the proceedings of these inferior tribunals to be governed by the act of the captain general ? No. The rule for their government was to be a royal order, and, as I understand from the whole document, the royal order of 19th February, which was to put down all criticism, as to the conduct of the privateers; that royal order which had been published in North America, and convicted the captured of smuggling. But this document, which was to explain the sentence, gives rise to n'ew conjectures, and involves the causes of condemnation in other ambiguities; for it states, as its justification, “that it appears the enemy does not respect the neutral flag, but captures all vessels leaving our ports, laden with goods, the manufacture of our country, and by a reciprocity founded on the said ordinance, we ought to declare, as good prize, the vessels of friendly powers, having on board enemies’ goods.” And, further, “ the private cruisers, which, in pursuance of this order, which authorises them to examine neutral vessels, and detain and carry them into port, in case of having well founded suspicion, have intercepted on the coast, and within sight of the ports of this province, the two vessels in question, under strong suspicion that almost the whole of the cargo belongs to our enemies.”
Did that royal order form any ground for this condemnation ? But the auditor, on the score of enemies’ goods, further proceeds : “ It is not known to whom the goods belong, except so far as is shewn by those who carry them, and it is very probable that, when they come, sealed with the arms of an enemy, they are part, if not the whole, enemies.”
That these goods were captured by Spanish privateers, is certain; it is certain that they were, at least provisionally, coridemhed ; but that they Were condemned on the ground of illicit or prohibited trade, unless that unlawfulness or prohi *72 bition was founded on the imperial decree adopted by Spain, does not appear in this sentence, nor in its justification by the auditor. For all these reasons I am prepared to say that the warranty Df the assured is not negatived by the sentence of condemnation; and that the decrees on which sentence of condemnation has passed, are gross violations of neutral law, and not binding on other nations; and the captures, under pretence of such decrees, are within the risk. That such decrees are void, ab initio, and that, when this seizure and condemnation were made, they were made as prize of war; justified on the ground that the laws of war, and the rights of reprisal, authorised the seizure and condemnation; that they were captured as prize of war, condemned as prize of war, and the booty'distributed among the privateers’ men, as boot taken in war.
The objection, on the ground of concealment, or misrepresentation, if there was colour for it, which I cannot discern, on the most minute examination of the whole evidence, comes too late. If it was now to prevail, there would be no end to the application for new trials..
New trial refused.